John Meyer, MT Bar # 11206
Cottonwood Environmental Law Center
24 S. Willson Avenue, Suites 6-7
Bozeman, MT 59715
(406) 587-5800 | Phone
John@Cottonwoodlaw.org


*Attorney for Plaintiffs*


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER;WESTERN WATERSHEDS PROJECT; WILDEARTH GUARDIANS; GALLATIN WILDLIFE ASSOCIATION<br><br>        Plaintiffs,<br><br>v.<br><br>U.S. SHEEP EXPERIMENT STATION; AGRICULTURAL RESEARCH SERVICE; U.S. FISH AND WILDLIFE SERVICE; and SALLY JEWELL, in her official capacity as Secretary of the Interior.<br><br>        Defendants. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

1.   This case seeks to enjoin the U.S. Sheep Experiment Station from grazing domestic sheep in the Centennial mountains of southwest Montana.

2.   The U.S. Sheep Experiment Station plans to graze sheep on an 8,300 acre parcel of land known as the Summer West allotment in July, August and September, 2014.

3.   The Summer West allotment is owned by the Agricultural Research Service and is located in the heart of an important grizzly bear corridor that connects Yellowstone to large Wilderness areas in Idaho.

4.   In 2010, the U.S. Fish and Wildlife Service asked the Sheep Station to find an alternative place to graze the sheep. The Sheep Station refused.

5.   In 2012, the Interagency Grizzly Bear Committee, which is comprised of several federal, tribal, and state agencies, also requested that the Sheep Station find an alternative place to graze the sheep. The Sheep Station again refused.

6.   Several months later, the U.S. Fish and Wildlife Service recovered the collar from grizzly bear #726.

7.   The collar had been cut off and placed in a stream under a rock.

8.   The bear's last live location was in the same area as the grazing sheep.

9.   The U.S. Fish and Wildlife Service recovered an empty rifle cartridge from the sheepherder's camp.

10. The 2014 Biological Opinion for the U.S. Sheep Station is arbitrary and capricious because it states that "[t]here have been no known grizzly bear/human encounters on the Sheep Station, other than observation of grizzly sign." Biological Opinion at 24.

11.  The U.S. Sheep Experiment Station has previously reported that grizzly bears

have chased sheepherders on the Summer West allotment.

12. Defendants have violated the National Environmental Policy Act by failing to prepare an Environmental Assessment or Environmental Impact Statement for the 2014 Incidental Take Statement, which allows the Sheep Station to "take" threatened grizzly bears.

13. Defendants violated the National Environmental Policy Act by issuing a Decision Notice in 2010 that allowed continued sheep grazing without first preparing a supplemental Environmental Assessment.

## JURISDICTION AND VENUE

14. Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 (Federal Question) and 1346, because this action involves agencies of the United States as Defendants, and arises under the laws of the United States, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., and the National Environmental Policy Act, 42 U.S.C. 4321 et seq.

15. An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district and because Plaintiffs are located in the district.

17. The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 701.

## PARTIES

18. Plaintiff Cottonwood Environmental Law Center ("CELC") is a non-profit law

firm and conservation organization based in southwest Montana that is dedicated to the protection of forests, water, and wildlife in the West, including the lands at issue here. Cottonwood has hundreds of members across Montana and Idaho.

19. Plaintiff Western Watersheds Project is a non-profit conservation group based in Hailey, Idaho and with field offices in eight states. Western Watersheds Project has over 1,500 members, volunteers, and supporters across the country. As an organization and on behalf of its members, Western Watersheds Project advocates for the protection and restoration of wildlife and watersheds throughout the West, including the lands and species at issue here.

20. Plaintiff WildEarth Guardians is a non-profit conservation organization with an office in Montana and six other states. WildEarth Guardians has more than 43,000 members and activists across the United States and the world. WildEarth Guardians protects and restores wildlife, wild places, wild rivers, and the health of the American West.

21. Plaintiff Gallatin Wildlife Association is a Montana-based conservation organization that promotes the restoration, maintenance, and perpetuation of native fish and wildlife and their habitat.

22. Members and staff of the plaintiff organizations use and enjoy, on a continuing and ongoing basis, the lands of eastern Idaho and southwest Montana, including the Summer West allotment grazed by the U.S. Sheep Experiment Station and surrounding areas, for hiking, fishing, hunting, camping, photographing landscapes and wildlife, and engaging in other vocational, scientific, and recreational activities. The Plaintiffs' members and staff derive aesthetic, recreational, inspirational, educational, and other

benefits from their activities in these areas on a regular and continuing basis and intend to do so frequently in the future, including during the summer of 2014.

23. The above-described aesthetic, recreational, inspirational, educational, and other interests of the Plaintiffs have been, are being, and, unless the relief prayed for is granted, will continue to be adversely and irreparably injured if Defendants continue to graze sheep without first completing an adequate Biological Opinion and Environmental Impact Statement. These are actual, concrete injuries to Plaintiffs, caused by Defendants' failure to comply with NEPA, the ESA, and the APA. The above-named injuries would be redressed by the relief requested in this Complaint.

24. Defendant U.S. Fish and Wildlife Service ("FWS") is a branch of the U.S. Department of Interior. The FWS is responsible for administering the provisions of the Endangered Species Act with regard to threatened species, including the threatened grizzly bears that use the land at issue in this case.

25. Defendant U.S. Sheep Experiment Station ("Sheep Station") is located in the upper Snake River plain in the foothills of the Centennial mountains, approximately six miles north of Dubois, Idaho. The Sheep Station owns approximately16,600 acres of land in the Centennial mountains, including the 8,300 acre Summer West allotment at issue in this case.

26. Defendant Agricultural Research Service ("ARS") is the U.S. Department of Agriculture's chief scientific in-house research agency. The ARS owns, operates, and oversees the Sheep Station and its activities.

27. Sally Jewell is the United States Secretary of the Interior. Secretary Jewell is responsible for overseeing the U.S. Fish and Wildlife Service.

## FACTUAL BACKGROUND

### The Greater Yellowstone Ecosystem

28. The region from Yellowstone National Park to the Yukon is widely recognized as a vital stronghold for the world's remaining wildlands and biodiversity, and the Greater Yellowstone Ecosystem is a significant component of this region.

29. The Greater Yellowstone Ecosystem encompasses millions of acres across eastern Idaho, southwest Montana, and northwest Wyoming, including two national parks, seven national forests, a dozen wilderness areas, and the headwaters of several of the United States best known rivers. Over seventy-five percent of the Greater Yellowstone Ecosystem consists of federal, public lands.

30. The Greater Yellowstone Ecosystem is one of the few remaining places in the United States where nearly all the species of plants and animals that were present prior to the arrival of Europeans to North America still survive. The Greater Yellowstone Ecosystem contains the greatest concentration of large mammals in the lower forty-eight states, and is one of the few temperate ecosystems where ecological processes such as predator-prey interactions are still in place. Elk, bison, bighorn sheep, lynx, wolves, wolverines, and grizzly bears are all found in this Ecosystem.

### The Threatened Grizzly Bear

31. Once over 50,000 strong in the lower forty-eight states, the grizzly bear is now a threatened species that roams less than two percent of its historic range. Before European settlement of the American West, grizzly bears (Ursus arctos horribilis) roamed the West from the Great Plains to the California coast, and south to Texas and Mexico, occupying almost every conceivable habitat. With westward expansion,

grizzlies were "shot, poisoned, and trapped wherever they were found." 90-Day Finding, 72 Fed. Reg. 14865, 14868 (Mar. 29, 2007).

32.  Grizzlies were reduced to less than 1,000 bears by 1975. In a historical blink of an eye, from the 1800s to the early 1900s, humans reduced the range of the grizzly bear to less than two percent of its former range south of Canada, limiting the bear to a few isolated populations in mountainous regions, wilderness areas, and national parks in Montana, Idaho, Wyoming, and Washington.

37. The Yellowstone population of grizzly bears is listed as "threatened" under the Endangered Species Act. Reinstatement of Protections for Grizzly Bear, 75 Fed. Reg. 14496, 14496 (Mar. 26, 2010).

38. Today, approximately 600 to 700 bears remain in the Greater Yellowstone.

39. Yellowstone grizzlies face significant threats to their survival and recovery, such as climate change, which impacts their key food sources. As whitebark pine trees continue to die, grizzly bears have expanded their search for food and increased the amount of meat they consume.

40. The Centennial Mountains of eastern Idaho and southwest Montana serve as an important east-west corridor for the grizzly bear, which needs the mountain range to travel between Yellowstone National Park and large wilderness areas in Idaho.

41. The Bitterroot ecosystem is currently unoccupied by grizzly bears.

42. The Centennial mountains are an important corridor that will allow the bears to reoccupy the Bitterroots.

### The U.S. Sheep Experiment Station

46. The Sheep Station has its headquarters in the upper Snake River plain at the

foothills of the Centennial Mountains, where it maintains a 27,930 acre ranch, including residential and office buildings, research facilities, and lands used for grazing.

47. The Sheep Station owns about 16,600 acres in the Centennial Mountains of Montana, which it uses for summer grazing and rangeland research. These lands make up two separate allotments—the East and West Summer allotments.

48. The Sheep Station also owns two additional ranch properties – the 2,600 acre Humphrey Ranch near Monida, Montana, and the 1,200 acre Henninger Ranch near Kilgore, Idaho.

49. In addition, the Sheep Station grazes sheep on several properties owned by other federal agencies: the Mudlake Feedlot (Department of Energy); and the Meyers Creek, East Beaver Creek, Snakey Canyon, and Kelly Canyon allotments (Forest Service).

50. In total, the Sheep Station uses over 50,000 acres of federal land for grazing. These lands are geographically diverse and they provide habitat for a variety of animals, including listed predators and sagebrush obligates.

51. The Meyers Creek allotment is located in the Centennial Mountains on the Caribou-Targhee National Forest, within the Primary Conservation Area for grizzly bears. It is, in fact, the only remaining allotment within the Primary Conservation Area where the U.S. Forest Service continues to authorize livestock grazing.  The Sheep Station uses the Meyers Creek allotment to trail sheep onto the Sheep Station's East Summer allotment under a permit from the U.S. Forest Service.

52. The Summer East, West and Meyers Creek allotments are home to black and grizzly bears, wolves, coyotes, foxes, moose, elk, deer and other wildlife.

53. Wolf packs have historically used the Centennial allotments and two entire packs

of wolves have been eliminated because of conflicts with the Sheep Station.

54. In 2012, two black bears were shot and killed on the Summer West allotment because they were eating sheep.

55.  The Idaho Department of Fish and Game has mapped occupied bighorn sheep habitat less than ten miles from the Summer West allotment.

**Impacts of Grazing**

56. Grazing by the Sheep Station impacts the environment in numerous ways, including by degrading range conditions through ground disturbance, introduction of invasive weeds, compaction, trampling, loss of vegetative cover and increased erosion.

57. Grazing over one thousand sheep in the middle of the Centennial Mountains— habitat occupied by bears, wolves, and possibility lynx— creates a black hole for carnivores.

58. Grizzly bears have depredated sheep on allotments grazed by the Sheep Station in the past and similar conflicts are expected to occur in the future.

59. Bears that have preyed on sheep immediately switch from natural foods to domestic sheep, thereby disrupting their natural movements and increasing the probability of human-bear conflict and hazing by Sheep Station employees.

60. Grizzly bears that become habituated to feeding on sheep at the Sheep Station later move to adjacent private livestock allotments where they are expected to be killed or removed.

61. Likewise, grazing in occupied wolf habitat leads to "predator control activities,"

including hazing, lethal removal of individual animals, and lethal removal of entire

packs. In 2008, two entire wolf packs were killed in response to predations on livestock,

including sheep on the Sheep Station allotments.

62. Every year, the Sheep Station's herders encounter black bears, which results in

hazing and control actions.  In 2012, two black bears were killed.

63. In the past, however, as many as eleven black bears have been killed in a single

year.

## PROCEDURAL BACKGROUND

### The 2007 Settlement

64.  In 2007, Western Watersheds Project and other environmental groups filed a

complaint in U.S. District Court for the District of Idaho against the Sheep Station, the

U.S. Department of Agriculture, the Agricultural Research Service, and the U.S. Forest

Service.

65.  The 2007 suit alleged that the Sheep Station had never prepared an

Environmental Assessment or Environmental Impact Statement pursuant to the National

Environmental Policy Act to assess the environmental impacts of the grazing and

associated activities on grizzly bears, lynx, wolves, bighorn sheep, or other components

of the environment affected by sheep grazing.

66.  The parties reached a settlement agreement under which the Agricultural

Research Service agreed to "prepare an 'Environmental Assessment' ("EA") or

'Environmental Impact Statement' ('EIS'), pursuant to the National Environmental

Policy Act ("NEPA"), regarding the grazing of sheep and related activities on U.S.

Sheep Experiment Station lands.

67. The 2008 settlement agreement provided, "The associated Decision Notice or Record of Decision shall be completed and signed on or before November 28, 2008."

68. The ARS further agreed to consult with the U.S. Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act to determine whether activities associated with the Sheep Station would jeopardize the continued existence of threatened or endangered species such as grizzly bears.

69. Pursuant to the settlement agreement from the 2007 litigation, the Agricultural Research Service prepared a Biological Assessment and concluded that the impacts of its sheep-grazing program "may affect, and are likely to adversely affect the Yellowstone Distinct Population of grizzly bear." The agency then entered into formal consultation with the FWS on August 19, 2011.

**The 2010 Decision Notice**

70. The Sheep Station issued an interim decision in November 2008 that was meant to govern grazing activities until the agency completed a more long-term EA on the impacts of sheep grazing in March 2010.

71. Before the agency completed the long-term EA, this Court issued an order enjoining and vacating the delisting of the Greater Yellowstone Area grizzly bear population. *Greater Yellowstone Coalition v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), *aff'd in part and rev'd in part,* 665 F. 3d 1015 (9th Cir. 2011).

72. In response, the Agricultural Research Service prepared a Supplemental Information Report to determine whether the new information or changed circumstances required the preparation of a Supplemental Environmental Assessment.

73. The Supplemental Information Report concluded that the continuation of grazing on the Summer West allotment would not result in a significant impact to grizzly bears requiring the preparation of a supplemental EA.

74. Based on the Supplemental Information Report, the agency issued a Decision Notice on March 21, 2010, that authorized grazing in the Summer West allotment to continue "until completion of the EIS, which is expected by March 2012."

75. The Decision stopped grazing in the Summer East and Meyers Creek allotments until the EIS is completed.

76. The agency has still not completed the EIS that was expected to be done more than two years ago.

### The 2013 Settlement

77. The Fish and Wildlife Service issued a Biological Opinion on U.S. Sheep Experiment Station Grazing and Associated Projects on November 8, 2011. The Opinion found that the adverse effects of sheep grazing were not likely to jeopardize the grizzly bear.

78. The 2011 BiOp excluded adjacent grazing allotments from the BiOp's action area and failed to provide an explanation for the methodology used to define the action area. The 2011 BiOp also omitted the impacts of private grazing from the environmental baseline, the effects of the action, and the cumulative impacts analysis. The 2011 BiOp was thus legally deficient.

79. On May 17, 2013, Cottonwood Environmental Law Center, Western Watersheds

Project, Gallatin Wildlife Association and other conservation organizations filed a complaint in the U.S. District of Idaho challenging the above deficiencies of the 2011 Biological Opinion.

80.  The parties reached a settlement agreement under which the Fish and Wildlife Service agreed to issue a new Biological Opinion on the Sheep Station's grazing and associated projects on or before June 1, 2014.

81.  The Defendants in the 2013 suit further agreed, "Prior to July 1, 2014, neither the Station nor any subdivision of the Department of Agriculture will permit sheep to graze on the Station's Summer East, Summer West, or Meyers Creek Pastures."

82.  The Court entered the settlement on February 1, 2014.  *Cottonwood Envtl. Law Center v. U.S. Fish & Wildlife Serv.,* 13-cv-235-BLW, Docket No. 31 at 5 (Feb. 1, 2014).

## STATUTORY BACKGROUND AND VIOLATIONS

### The National Environmental Policy Act

83.  NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

84.  "Congress's determination in enacting NEPA was that the public interest

requires careful consideration of environmental impacts *before* major projects may go forward." *South Fork Band Council of W. Shoshone of Nevada v. U. S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (emphasis added).

85.  Although the Sheep Station was founded almost a century ago, Defendants have unreasonably delayed issuing a final Environmental Impact Statement and Record of Decision for the Sheep Station's activities.

86.  NEPA imposes on federal agencies a continuing duty to supplement existing EAs and EISs in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1509(c)(1)(ii).

87.  The agency decision not to prepare a supplemental EA in 2010 violates NEPA.

88.  The Supplemental Information Report failed to acknowledge and address the "substantial concerns" raised by the U.S. Fish and Wildlife Service regarding the impacts on grizzly bears.

89.  The issuance of an Incidental Take Statement "constitutes major federal action for purposes of NEPA" and requires an agency to prepare an EA and possibly an EIS. *See Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996).

90.  The Sheep Station's existing NEPA analysis assumes, "Grizzly bear mortality from U.S. Sheep Experiment Station activities would not occur."

91.  The 2014 Incidental Take Statement authorizes "take in the form of capture or

kill of one adult grizzly bear (male or female) or one adult female grizzly bear and her dependent cubs."

92. "The agencies are expected to concurrently comply with both Section 7 of the ESA and NEPA." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 647-48 (9th Cir. 2014) (citing 50 C.F.R. § 402.06).

93. The Agricultural Research Service thus violated NEPA by failing to complete an EA or EIS for the 2014 Incidental Take Statement that accompanies the Biological Opinion.

## The Endangered Species Act

91. The ESA's purpose is to provide a program to conserve threatened and endangered species and a means to protect the ecosystems upon which those species depend. 16 U.S.C. § 1531(b).

92. Section 7(a)(2) of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the designated critical habitat of the listed species. 16 U.S.C. § 1536(a)(2). To assist action agencies in complying with this provision, Section 7 and its implementing regulations set out a detailed consultation process for determining the impacts to listed species of the proposed agency action. *Id.*; 50 C.F.R. §§ 402.1 et seq.

93. In preparing a Biological Opinion, the FWS must delineate an "action area." 50

C.F.R. § 402.02. The action area must include "all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action." *Id.*

94. Once an action area is delineated, the FWS must evaluate the "environmental baseline," which includes "the anticipated impact of all proposed Federal projects in the action area that have already undergone . . . consultation, and the impact of State or private actions which are contemporaneous with the consultation process." 50 C.F.R. § 402.02.

95. The environmental baseline in the 2014 Biological Opinion states that "[T]here have been no reported grizzly bear/human encounters on the Sheep Station, other than observation of grizzly sign." BiOp at 24.

96. There have been at least two reports of grizzly/bear human encounters on the Summer West allotment.

97. The 2014 Biological Opinion states there have been four grizzly/bear sheep encounters in the last ten years.

98. The 2010 Wildlife Specialist Report states there were five grizzly/sheep conflicts between 2007 and 2008 alone.

99. The Incidental Take Statement allows the "take" of one grizzly bear.

100. Term and Condition Number 3 requires defendants to "develop and formalize a Service-approved data collection and analysis protocol to facilitate the identification of individual bears for the purpose of assigning take events to Sheep Station activities as appropriate."

101.  The Incidental Take Statement does not have any method for determining when there has been a "take" of a grizzly bear that would require the re-initiation of consultation.

102.  The Incidental Take Statement is invalid because it does not contain a way to determine when re-initiation of consultation is required.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:

### FAILURE TO PREPARE A SUPPLEMENTAL EA

103.  Plaintiffs reallege and incorporate by reference the preceding paragraphs.

104.  This First Cause of Action challenges the U.S. Sheep Station and the Agricultural Research Service's 2010 Decision Notice and Supplemental Information Report.

105.  The agencies' decision not to prepare a Supplemental Environmental Assessment after completing a Supplemental Information Report in 2010 violates the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and NEPA's implementing regulations.

106.  The Sheep Station/Agricultural Research Service failed to consider and discuss facts and evidence supplied to it that suggest continued grazing in the Summer West Allotment would have significant impacts on grizzly bears and the environment.

## SECOND CAUSE OF ACTION

## FAILURE TO PREPARE AN EA OR EIS FOR THE INCIDENTAL TAKE STATEMENT

107.  Plaintiffs reallege and incorporate by reference the preceding paragraphs.

108.  This Second Cause of Action challenges the Defendants' violation of the National Environmental Policy Act by issuing an Incidental Take Statement without analyzing the impacts of the Incidental Take Statement in an Environmental Assessment or Environmental Impact Statement.

109.  The issuance of an Incidental Take Statement is a major federal action that must be analyzed in an EA or an EIS. *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996); *Leatherback Sea Turtle v. Nat'l Marine Fish. Serv.*, 99–cv-152-DAE, 1999 WL 33594329, at *15-16 (D. Hawaii).

110.  Defendants violated the National Environmental Policy Act by issuing the 2014 Incidental Take Statement without preparing an Environmental Assessment or Environmental Impact Statement.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE ENDANGERED SPECIES ACT

111.  Plaintiffs reallege and incorporate by reference the preceding paragraphs.

112.  This Third Cause of Action challenges the U.S. Fish and Wild Service and Secretary Jewell's violation of the Endangered Species Act by issuing a legally inadequate Biological Opinion.

113.  The 2014 BiOp is arbitrary and capricious and/or contrary to law in numerous respects, including, but not limited to:

        A.  The environmental baseline failed to consider previous grizzly/human encounters.

B.   The environmental baseline failed to consider previous grizzly/sheep conflicts.

**FOURTH CAUSE OF ACTION**
**INVALID INCIDENTAL TAKE STATEMENT**

114. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

115. This Fourth Cause of Action challenges the U.S. Fish and Wild Service and Secretary Jewell's violation of the Endangered Species Act by issuing a legally inadequate Incidental Take Statement.

117.  The Incidental Take Statement is invalid because it does not contain any method for determining when there has been a "take" of a grizzly bear that would require the re-initiation of consultation.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court:

1)   Adjudge and declare that Defendants have violated the National Environmental Policy Act and the Administrative Procedure Act by:

A.) Adopting the 2010 Decision Notice that allowed continuing sheep grazing on the Summer West Allotment without first preparing a Supplemental EA; and

B.) Failing to complete an EA or EIS for the Incidental Take Statement.

2)   Adjudge and declare that the U.S. Fish and Wildlife Service and Secretary Jewell have violated the Endangered Species Act and Administrative Procedure Act by issuing a legally inadequate Biological Opinion and Incidental Take Statement.

3) Order Defendants to comply with the requirements of NEPA and the APA by promptly issuing a supplemental EA for the 2010 Decision Notice and an EA or EIS for the Incidental Take Statement.

4) Order Defendants U.S. Fish and Wildlife Service and Secretary Jewell to comply with the requirements of the ESA and APA by promptly completing a new Biological Opinion and Incidental Take Statement supported by proper NEPA analysis.

5) Enjoin Defendants U.S. Sheep Experiment Station and Agricultural Research Service from grazing in the Centennial mountains until they have complied with NEPA, the ESA and the APA.

6) Award Plaintiffs their reasonable attorney fees, costs, and litigation expenses, under the ESA, the Equal Access to Justice Act, and/or any other applicable provision of law.

7) Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of the Plaintiffs, the Public, and the environment.


Dated: June 23, 2014


Respectfully submitted,

/s/ John Meyer
JOHN MEYER

*Attorney for Plaintiff*