IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER; WESTERN WATERSHEDS PROJECT; WILDEARTH GUARDIANS; GALLATIN WILDLIFE ASSOCIATION, | CV 14–192–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| U.S. SHEEP EXPERIMENTAL STATION; AGRICULTURAL RESEARCH SERVICE; U.S. FISH AND WILDLIFE SERVICE; SALLY JEWELL, in her official capacity as Secretary of the Interior, | |
| Defendants. | |

Before the Court is Plaintiffs' motion for attorneys' fees and costs filed

pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(4). For the

reasons discussed below, Plaintiffs' motion is granted in part.

## BACKGROUND

On June 23, 2014, Plaintiffs brought a lawsuit under the ESA and National

Environmental Policy Act ("NEPA") challenging the environmental analyses for

the United States' Sheep Experiment Station ("USSES") near Dubois, Idaho. The USSES is managed by the Agricultural Research Service ("ARS"), a research agency of the United States Department of Agriculture ("USDA") that oversees over 800 individual projects aimed at improving national agriculture. The USSES near Dubois, Idaho, allows sheep to graze on rangelands, and rotates sheep through individual pastures as climate, staffing, and rangeland health permit. At issue in this case is the high-elevation "Summer West Range," which relies on sheep provided by the University of Idaho during its limited summer grazing season (usually May or June through August or September). This range overlaps with grizzly bear habitat, a species listed as "threatened" under the ESA. The Summer West Range is located in the heart of an important grizzly bear corridor in the Centennial Mountains that connects Yellowstone National Park to large wilderness areas in Idaho.

Plaintiffs claim under the ESA that the U.S. Fish and Wildlife Service's ("Service") 2014 Biological Opinion for the USSES is arbitrary and capricious because it states that "[t]here have been no known grizzly bear/human encounters on the Sheep Station, other than observation of grizzly sign." (Docs. 20 at 2; 3-7 at 28.) Plaintiffs allege that the USSES previously reported that grizzly bears chased sheep herders on the Summer West Range, a fact which was not included

in the Biological Opinion. Plaintiffs further allege that Defendants have violated NEPA by failing to prepare an Environmental Assessment or Environmental Impact Statement for the 2014 Incidental Take Statement, which allows the USSES to "take" threatened grizzly bears, and by issuing a decision notice in 2010 that allowed continued sheep grazing without first preparing a supplemental environmental assessment.

One day after filing their Complaint, on June 24, 2014, Plaintiffs moved for a preliminary injunction to enjoin domestic sheep grazing in the Centennial Mountains. Approximately two weeks later, on July 9, 2014, the Court denied Plaintiffs' motion for a preliminary injunction because Defendants provided notice, through a sworn declaration of Laurence D. Chandler, Acting Associate Administrator for Research Operations and Management of the USDA's ARS, that they had no intention of grazing sheep on the Summer West Range prior to June 1, 2015. (Doc. 11.)

Subsequently, on September 10, 2014, Plaintiffs filed an amended complaint with the Court, continuing to seek declaratory and injunctive relief and adding a fifth cause of action based on the Defendants' alleged reliance on a faulty Biological Opinion. (Doc. 20.) Defendants filed their answer on September 24, 2014, and lodged the Administrative Record on January 9, 2015. No further

substantive action occurred in this case until the parties filed a joint motion to stay

the case because the Service prepared and transmitted a new Biological Opinion

on February 25, 2015 ("2015 Biological Opinion"), which replaced the Opinion at

issue in Plaintiffs' Complaint and rendered Plaintiffs' ESA claims moot. (Doc.

42.) The Court issued the stay, which was continued until the Plaintiffs' motion

for voluntary dismissal was granted on March 16, 2016. (Docs. 55; 56.)

On March 25, 2016, Plaintiffs filed their motion for attorneys' fees and

costs, and simultaneously requested that the Court extend the deadline to file the

supporting brief. The Court granted this request, requiring Plaintiffs to submit a

memorandum in support of their motion by June 1, 2016. On June 1, 2016,

Plaintiffs submitted a memorandum in support of their initial fee request, seeking

$63,146.37 under the catalyst theory of the ESA. (Docs. 61; 62.) Plaintiffs assert

that they "should be permitted to recover their reasonable attorney's fees because

this litigation was cited by the Secretary of the Department of Agriculture as a

reason why he decided to end domestic sheep grazing by the USSES in the

Centennial Mountains." (Doc. 61.) Plaintiffs attached Exhibit 1, a letter dated

November 10, 2014, signed by Secretary of the United States Department of

Agriculture, Thomas J. Vilsack, accompanied by a detailed report made by the

USDA for the House and Senate Agriculture Appropriations Subcommittees

-4-

informing them of ongoing sheep research within the ARS. In the report, the USDA expressly mentions "lawsuits" and "injunctions" that have impacted the Department's research programs. (Doc. 61-1.)[1]

Thus, although the claims asserted in the complaint and amended complaint were never decided on the merits, Plaintiffs insist that they are entitled to attorneys' fees and costs because their complaint and amended complaint were the catalyst for Defendants' decision to update the 2014 Biological Opinion to include reference to grizzly bear encounters at the USSES in the 2015 Biological Opinion. Defendants counter that Plaintiffs have failed to show a causal connection between their lawsuit and the revised 2015 Biological Opinion, or any other action by the USDA since the commencement of the lawsuit.

## LEGAL STANDARD

Under the ESA, a district court may award costs of litigation, including reasonable attorney fees, to any party, whenever the court determines such an award is appropriate. 16 U.S.C. § 1540(g)(4). An award is appropriate when the plaintiffs have achieved some degree of success on the merits. *Ruckelshaus v.*

---

[1]The report does not provide any specifics regarding the lawsuits, other than a statement that "[s]ince 2007, various environmental groups sued ARS three times over grazing activities at the USSES." (Doc. 61-1 at 4.) The Court understands that the Plaintiffs in the subject case are most likely the only environmental groups to have sued ARS in connection with this specific sheep station, and that the only injunction that has been sought is the one filed in this case.

*Sierra Club*, 463 U.S. 680, 684 (1983). But even in cases like this one, where the court has not ruled on the merits of the complaint, ESA plaintiffs may recover fees and costs under the "catalyst theory." *Assn. of Cal. Water Agencies v. Evans*, 386 F.3d 879, 885 (9th Cir. 2004). The catalyst theory allows attorneys' fees to be awarded to a "plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the 'sought-after destination' without obtaining any judicial relief." *Id.* at 884. First, the court must consider whether the plaintiffs obtained at least "some of the benefits they sought in the suit." *Id.* at 886. Second, the court must assess whether there was "a clear, causal relationship between the litigation brought and the practical outcome realized." *Id.* (internal citation and quotation marks omitted). Finally, "the court must determine that the benefit achieved was required by law and was not a gratuitous act of the defendant." *Id.* at 886, n. 3 (internal citation and quotation marks omitted).

If, under the catalyst theory of recovery, the court finds that the plaintiff did prevail and an award is appropriate, the court must then determine what constitutes a reasonable amount of attorneys' fees. The lodestar method provides "the most useful starting point for determining the amount of a reasonable fee . . . ." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). That calculation

requires a court to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Id.* "The prevailing market rate in the community is indicative of a reasonable hourly rate." *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1262 (9th Cir. 1987); *see also Int'l Woodworkers of Am., AFL-CIO, Local 3-98 v. Donovan*, 792 F.2d 762, 765–766 (9th Cir. 1985) ("The lodestar figure of reasonable hours times a reasonable market rate is presumptively a reasonable attorney's fee under a statute."). In determining reasonable hours, "[t]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citing *Hensley*, 461 U.S. at 437). "The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Id.* at 1397–1398.

Hours may be reduced by the court if the hours expended are determined to be excessive or otherwise unnecessary. *Hensley*, 461 U.S. at 433–434. In finalizing a fee award, the district court should "provide a concise but clear explanation of its reasons for the fee award" and "should make clear that it has considered the relationship between the amount of the fee awarded and the results

obtained." *Id.* at 437. A district court also has discretion to award costs—such as telephone calls, postage, air courier and travel expenses— that are ordinarily billed to a client and are routine under fee statutes. *Int'l Woodworkers*, 792 F.2d at 767.

## ANALYSIS

## I.     Prevailing Party Under the Catalyst Theory

The Court finds that the Plaintiffs' complaint and amended complaint did play a causative role, in varying degrees, in three actions by Defendants: (1) the USDA's proposed transition of the ARS and approval to close the USSES near Dubois, Idaho, as documented in the report attached to Secretary Vilsack's November 10, 2014, letter; (2) the agreement by the ARS not to graze on the USSES Summer West Range prior to June 1, 2015; and (3) the Defendants' decision to issue a new 2015 Biological Opinion identifying grizzly bear encounters at the USSES.

In their motion for attorneys' fees, Plaintiffs argue that there was a decision on the merits in their favor. Plaintiffs claim that this Court's ruling on May 19, 2015, is essentially a ruling on the merits because when it granted Defendants' motion to continue the stay in this case, the order also included the following language: "IT IS FURTHER ORDERED that Defendants shall file a notice in this case at least sixty (60) days prior to the commencement of any grazing activities in

the Summer West Range. This includes any form of construction, habitation, or other on-site preparation activities." (Doc. 50 at 2–3.) Plaintiffs contend that this 60-day notice requirement equates to success on the merits because Defendants were ordered to discontinue future sheep grazing unless notice was provided to the Court and the Plaintiffs. Defendants argue that this was purely a procedural victory and that, under a prevailing party standard, the United States Supreme Court has found that such a procedural victory does not justify an award of fees. *Ruckelshaus*, 463 U.S. at 688 n. 9. The Court agrees with Defendants that this procedural ruling falls short of a successful decision on the merits because the Court was merely providing "Plaintiffs with a safety mechanism" should the Defendants go back on their word that they would cease sheep grazing at the USSES near Dubois, Idaho. (Doc. 50 at 2.)

Nonetheless, even though there is no specific judgment on the merits in this case that Plaintiffs can point to establishing success on the merits, the Court finds that the Plaintiffs' lawsuit did indeed promote and expedite Defendants' decision to end sheep grazing at the USSES, which allows them to recover fees under the catalyst theory. Specifically, in the USDA's congressional report dated November 10, 2014, which suggested permanent closure of the USSES, multiple lawsuits filed against the USSES are described as having created a general atmosphere of

uncertainty as to the viability of the USSES.  At page 2 of the report the USDA

explained the following to Congress:

**Impact to Research Program**:

The USSES faces a number of other challenges to accessing grazing
lands for its sheep research.  Since 2007, various environmental
groups sued ARS three times over grazing activities at the USSES.

These legal actions introduce further uncertainty in the availability of
grazing lands for research, and the agency's ability to allocate
resources and implement approved project plans are seriously
hindered.

(Doc. 61-1 at 3–4.)  The report goes on to state on page 3:

**Rationale for the USSES Closure:**

. . .

When the pressures to limit or reduce ARS' use of grazing lands at
the USSES through lawsuits, injunctions, or the termination of
grazing allotments are added, there exists a general atmosphere of
uncertainty that makes it difficult for ARS to properly plan or
implement its research activities at this location.

(Doc. 61-1 at 5.)  Finally, in the summary portion of the report it again refers to

lawsuits filed against the USSES:

**SUMMARY:**

Withdrawal of critical rangeland resources by BLM and continued
challenge from environmental groups opposed to livestock grazing
along a corridor that includes the USSES summer range has eroded
ARS' ability to sustain a viable range sheep research program at the

Dubois location. . . . As a result, USDA has proposed the closure of the USSES and the reprogramming of its resources to high-priority research at other locations in Idaho.

Defendants counter that the USDA's recommendation to close the USSES has no legal effect, was unrelated to Plaintiffs' instant suit, and was an independent internal agency action; in effect, a "gratuitous gesture not required by the ESA." (Doc. 65 at 16.)

The Court disagrees. All that is required under the catalyst theory of recovery is that a party achieve *some* success, or some of the benefits sought in the suit. The USDA mentions lawsuits by various environmental groups throughout the report as a main reason for proposing closure of the USSES. Moreover, the report made by the USDA was required by law to be submitted to Congress, at the specific request of the House and Senate Agriculture Appropriations Subcommittees. Hence, the preparation of the report itself, and the recommendations contained within it, were not simply gratuitous acts by the Defendants.

The Court understands that complete closure of the sheep station has not yet occurred and that it remains open due to Congressional budget riders. (Doc. 67 at 4.) However, what is not occurring at the USSES is domestic sheep grazing—the exact activities Plaintiffs sought to enjoin in this action. Plaintiffs' lawsuit clearly

put pressure on the USDA to act and inform Congress of the best way to utilize ARS resources. Therefore, the report illustrates at lease some success by the Plaintiffs, given that the instant lawsuit did cause, in part, the Defendants to propose closure of the USSES to Congress.

Furthermore, when the Service prepared and transmitted a new 2015 Biological Opinion, it corrected the failure of the 2014 Biological Opinion to account for grizzly bear encounters at the USSES, which was a claim raised by the Plaintiffs in their amended complaint. (Docs. 20 at 2; 3-7 at 28.) Consequently, Defendants' addition of grizzly bear encounters in the 2015 Biological Opinion mooted Plaintiffs' ESA claims. Defendants claim that the 2015 Biological Opinion was triggered by preexisting agency guidance, and not by Plaintiffs' lawsuit. Defendants argue that when the USSES was unable to generate a protocol for evaluating the station-related take, the Service determined that its original conclusions warranted revision, and that is why the Service issued a new 2015 Biological Opinion.

Due to the unique timeline of the events that occurred in this case, the Court is unable to definitively determine if the 2015 Biological Opinion was in fact a separate and independent action by the Defendants. What is clear is that the 2015 Biological Opinion addressed and accounted for grizzly bear encounters that the

Plaintiffs identified in their preliminary injunction brief. Notably, this change in the Biological Opinion prompted the Plaintiffs to file the joint motion to stay the case and subsequent motion to dismiss the case with prejudice. (Docs. 42; 55.) Thus, the Court concludes there is some causal connection between the Plaintiffs' lawsuit and the issuance of the 2015 Biological Opinion.

Once Plaintiffs filed their Complaint, every legal step the Plaintiffs took prompted a step by the Defendants. Therefore, the Court finds that Plaintiffs are a prevailing party in this lawsuit under the catalyst theory of recovery. However, Plaintiffs' recovery will be limited to the time spent between initiating this lawsuit and the USDA's November 10, 2014, report. With the exception of the 2015 Biological Opinion which was transmitted on February 25, 2015, Plaintiffs' success in this case culminated at the time of the USDA's November 10, 2014, report. Regarding the 2015 Biological Opinion, the legal work which raised the issue of grizzly bear encounters occurred before November 10, 2014. The Court appreciates that Plaintiffs' counsel continued to work on the case following this date, however this work did not produce any appreciable further success warranting the award of attorneys' fees. In other words, there is insufficient support in the record to conclude that the Plaintiffs' legal maneuvers in this case had any impact on the Defendants actions following the issuance of the November

10, 2014, report, and, consequently, no fees and costs will be awarded to the Plaintiffs for work done following November 10, 2014.

## II.   Number of Hours

Plaintiffs claim $63,146.37 in attorneys' fees and costs.[2] This figure includes 259.6 hours of attorney related work at $240.00 per hour, a $400.00 filing fee, $192.57 in postage for Plaintiffs' preliminary injunction motion, and $250.00 for Natalie Havlina's *pro hac vice* fee. Counsel John Meyer submitted his time sheets for the period from June 10, 2014, to May 19, 2015, and co-counsel Natalie Havlina submitted her time sheets for the period from February 17, 2014, to May 8, 2015.

In their response, Defendants insist that if the Court finds Plaintiffs are entitled to fees, the hourly rates and the number of hours claimed by the Plaintiffs are both excessive and unreasonable. First, Defendants contend that Plaintiffs have sought compensation for undocumented work. Defendants point to 13.2 hours of work that Plaintiffs counted toward Mr. Meyer's 215.6 hours of work, for which there are no entries. Defendants further contend that the amount of time

---

[2] This is the total amount of attorneys' fees and costs included in Plaintiffs' original motion. (Docs. 61-2; 62 at 5.) This figure does not include the additional fees and costs Plaintiffs accrued and submitted to this Court following their motion. See Exhibit 1 attached to this Order for a full accounting of hours requested by Plaintiffs. In Exhibit 1, the Court included all hours reported by Plaintiffs from the commencement of this lawsuit until November 10, 2014, and all hours related to recovering their fees and costs. (Docs. 61-2; 67-3; 81-2.)

-14-

should be reduced for the 88 hours related to the motion for a preliminary

injunction and the hours related to the work performed on the unsuccessful NEPA

claims.[3]  Finally, Defendants object to Plaintiffs' requested costs.

Plaintiffs counter that the Court should defer to the winning lawyer's

professional judgment as to how much time he was required to spend on the case,

and that all hours worked would have been normally billed to a client.

Nevertheless, Plaintiffs stipulate to the following reductions of their requested fee

award: (1) any hours worked after the issuance of the 2015 Biological Opinion—a

27.9 hour reduction; and (2) any hours related to time spent NEPA claims.[4]

Plaintiffs maintain that they should recover the hours spent on their attorneys' fee

application, even though it was prepared after the 2015 Biological Opinion.

As stated above, the Plaintiffs' recovery will be limited to the time

expended between commencement of the lawsuit and the November 10, 2014,

report, excluding time spent on the NEPA claims and on other tasks that were

unrelated to the ESA claims at issue here, such as fees for researching impacts on

wolverines.  The Court will further reduce any hours corresponding to

---

[3] With respect to the NEPA claims, Defendants contend that any hours related specifically to NEPA claims should be deducted in their entirety.  Defendants further argue that any entry related to both the NEPA and ESA claims should be reduced by half.  (Doc. 65 at 25–27.)

[4] Plaintiffs did not seek reimbursement for the hours relating to the NEPA claims in their original motion, but these hours were included in their reply brief.  (Doc. 67-3.)

administrative tasks, which will be accounted for, but reimbursed at a lower hourly rate. (*See infra*, Section IV.) Finally, any hours that did not have corresponding entries will be excluded.

Plaintiffs will be compensated for the time spent on the preliminary injunction. While the Court denied the Plaintiffs' motion for a preliminary injunction, it was because Defendants represented that they would not begin grazing on the Summer West Range until June 1, 2015, if at all, which vitiated any argument as to irreparable and immediate harm and rendered Plaintiffs' preliminary injunction motion moot. (Doc. 11.) However, there exists evidence in the record that the parties consistently communicated about the outcome of the preliminary injunction and were in negotiations prior to the Court's order on the stipulation between the parties where the USDA agreed it would not graze on the Summer West or Summer East pastures until June 1, 2015, in exchange for which the Plaintiffs agreed to withdraw their motion. (Docs. 9 at 6-12; 9-1.) Therefore, it is reasonable to conclude that the preliminary injunction prompted Defendants to represent to this Court that there would not be any grazing until summer 2015. For this reason alone, the Court grants Plaintiffs request for attorney fees regarding the preliminary injunction under the catalyst theory. This conclusion is further supported by the reference in the November 10, 2014, report to

"injunctions" that impacted the USSES and contributed to the USDA's decision to propose closure of the station. (Doc. 61-1 at 5.)

Consequently, the total hours incurred by the Plaintiffs from the commencement of this lawsuit until November 10, 2014, is 152.4 hours.[5]

The next issue is whether all of these hours are reasonable for the work performed and the results achieved, which is the essence of the lodestar analysis. Simply stated, the primary substantive work performed by the Plaintiffs attorneys was the drafting and filing of a complaint, amended complaint, and a motion for a preliminary injunction. The primary results achieved by these legal actions were the limited revisions to the 2015 Biological Opinion discussed above, the stipulation by the Defendants not to graze until June 1, 2015, and the decision by the USDA to propose closure the USSES, an action yet to occur, and which was the result of multiple factors, not exclusively the Plaintiffs' legal actions. The legal work performed and the results obtained were both modest in scope and do not warrant, in the Court's opinion, an award of attorneys' fees for 152.4 hours. The Court is willing to defer to the professional judgment of the prevailing

_____

[5]This figure represents the total hours spent until November 10, 2014 (237.5 hours), less the deductions for the NEPA-related hours (87.5 hours), administrative task hours (13.1 hours), and 0.5 hours for unrelated tasks. These calculations are summarized on the spreadsheet attached to this Order as Exhibit 1.

attorney as to how much time was required by the case, but only to the extent the amount of time expended is reasonable. The Court concludes that the modest results in this case support a 40% reduction.[6] The amount of time spent by Plaintiffs' counsel to achieve the success in this case was excessive and unnecessary. This is not to say that counsel for the Plaintiffs wasted time or "padded" his billing records. Many hours were dedicated to tasks in this case that did not contribute to the results obtained. Or stated another way, the modest success in this case could have been achieved with a lot less lawyering. Therefore, the total hours to be paid to Plaintiffs' attorneys from the commencement of this lawsuit until November 10, 2014, is 91.4 hours.[7]

Plaintiffs are also entitled to recover their fees and expenses incurred in seeking their fees and costs in this case, without reduction, because without

---

[6] This deduction is supported by attorneys' fee awards in other cases, which involved considerably more legal work, and where more significant results were obtained. For example, in *Alliance for the Wild Rockies v. Krueger*, No. CV 12-150-M-DLC, 2014 WL 46498 (D. Mont 2014), plaintiffs were awarded approximately 256 hours for their litigation in this Court, which included briefing on supplementing the administrative record, a preliminary injunction, cross motions for summary judgment, and a motion to strike the record. In *Krueger*, the plaintiffs obtained a substantial result on the merits when this Court enjoined defendants from implementing the Cabin Gulch Project. However, here the Court does not agree that 152.4 hours is warranted when the only legal work Plaintiffs performed is the filing of their complaint and the briefing of their unsuccessful motion for a preliminary injunction. Accordingly, the Court finds that a 40% overall reduction in hours until November 10, 2014, is proportional to the modest results Plaintiffs obtained.

[7] A 40% reduction from 152.4 hours equals 91.4 hours.

compensation, prevailing parties are forced into extensive, uncompensated litigation in order to gain any fees. *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 162 (1990) (citing *Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979), *aff'd on other grounds*, 448 U.S. 122 (1980) (internal citations omitted)). The Ninth Circuit has also upheld attorneys' fees awards for time spent in applying for fees. *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 103 F. App'x 627, 630 (9th Cir. 2004) (upholding the district court's award for plaintiffs claimed hours for their original and renewed motion for attorneys' fees as reasonable). The total hours Plaintiffs spent in applying for fees is 87.5 hours.

Therefore, the Court will award the following hours to Plaintiffs:

| | |
|---|---|
| Total hours for Mr. Meyer and Ms. Havlina from the commencement of the lawsuit until November 10, 2014 (including the deductions detailed above) | 91.4 |
| Total hours incurred in legal proceedings to collect fees and expenses | 87.5 |
| **Subtotal:** | **178.9 hours** |

## III.  Reasonable Rate

The parties dispute what constitutes the relevant community within which to compare Plaintiffs' requested hourly rate. Plaintiffs argue that the reasonable hourly rate here is $240 per hour in light of the experience, skill, and reputation of Mr. Meyer, a Montana attorney specializing in environmental law. Plaintiffs cite

to a recent decision from this Court to support their request: *Alliance for the Wild Rockies v. Krueger*, No. CV 12-150-M-DLC, 2014 WL 46498 at *6 (D. Mont 2014). Plaintiffs argue that in *Krueger*, the Court awarded Rebecca Smith, an environmental law attorney in Montana, $230 per hour for her work litigating in district court in 2013. Plaintiffs ultimately seek a rate of $240 per hour for work performed in 2014, 2015, and 2016, citing again to *Krueger* where the Court recognized a $10/hour increase per year. Defendants counter that Plaintiffs have not submitted outside expert opinion testimony supporting the hourly rate requested in this case.

Mr. Meyer's affidavit reveals that he is an experienced environmental lawyer in Montana. Mr. Meyer has been counsel of record in numerous lawsuits in the Montana District and the Ninth Circuit, has an extensive background working in the specialty of environmental law, and often lectures to college students and other attorneys regarding the ESA. Mr. Meyer is no stranger to this Court. Therefore, the Court agrees with Plaintiffs that Mr. Meyer is entitled to the same $230 per hour fee award that this Court compensated a similarly situated attorney. However, the Court will not increase that amount to $240 per hour, because Plaintiffs have not sufficiently supported their reasoning to increase the amount by $10/hour. Plaintiffs only cited to *Krueger* without documenting the

normal hourly rate Mr. Meyer billed to clients in 2014, 2015, and 2016, nor did Plaintiffs prove that a $10/hour rate increase per year is warranted. The amount of $230/hour was and remains a reasonable, if not generous, rate for legal work of the kind performed in this case. Ms. Havlina will be paid at the same rate as Mr. Meyer. Thus, the Court will award the following amount for attorneys' fees:

| Total attorneys hours | 178.9 |
|---|---|
| Total at $230 per hour: | $41,147.00 |

## IV. Administrative Tasks

Defendants contend that Plaintiffs should not be compensated at the same attorney hourly rate for administrative or secretarial entries. In total, Plaintiffs claim fees for 13.1 hours of administrative tasks, including dropping items off at the post office, creating a certificate of service, creating a table of authorities, creating an exhibit list and compiling exhibits, and filing their Complaint. Generally, it is neither necessary nor cost-effective for an attorney to perform these functions, but is sometimes required when the attorney is a solo practitioner without any support staff. In *Krueger*, the Court awarded an hourly rate of $75 per hour for administrative tasks, which is the same rate that will be used for comparable tasks in this case. 2014 WL 46498 at *6 (citing *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989)). Therefore, the Court awards the following to

Plaintiffs with regard to administrative tasks:

| Hours related to administrative tasks | 13.1 |
|---|---|
| Total at $75 per hour: | $982.50 |

## V.    Costs

Plaintiffs claim they are further entitled to all costs associated with the litigation.  They assert that Defendants should reimburse them for the $400 filing fee, $192.57 in postage, $250 for Ms. Havlina's *pro hac vice* fee, and $302.20 in lodging expenses.  Defendants contend that Plaintiffs' *pro vac vice* fee was not properly shifted to Defendants since there was no indication that registration of an additional out-of-state counsel was necessary to resolve the case, and that the $192.57 in postage was requested without proper receipts.  Plaintiffs replied by submitting a financial affidavit of a picture of six UPS postal receipts totaling $192.57.  (Doc. 68.)

The Court has discretion to award costs that are ordinarily billed to a client and are routine under fee statutes.  Therefore, the Court will award costs to Plaintiffs for filing their Complaint, postage, and hotel expenses.  The Court wonders whether Ms. Havlina was indeed necessary to the successful litigation of this case.  Mr. Meyer was the lead attorney, the only point of contact with opposing counsel Travis Annatoyn, the only counsel who appeared at both the

mediation and hearing, and the lead attorney who performed the work to bring this case to fruition. Nevertheless, because Ms. Havlina's fees are being awarded, Defendants will also be required to reimburse her *pro hac vice* fee of $250. Plaintiffs are awarded $1,144.77 in costs.

Accordingly, IT IS ORDERED that Plaintiffs' motion for attorney fees (Doc. 23) is GRANTED IN PART and DENIED IN PART. Defendants shall compensate Plaintiffs as follows: $41,147.00 in attorneys' fees, $982.50 in administrative fees, and $1,144.77 in litigation costs, for a total of $43,274.27.

DATED this 5th day of December, 2016.

Dana L. Christensen, Chief Judge
United States District Court